## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| BRENDA SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 1:18-cv-00352-NT |
| v. | ) | |
| | ) | |
| AROOSTOOK COUNTY and SHAWN D. GILLEN, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S POST-TRIAL MEMORANDUM

## INTRODUCTION

The plaintiff, Brenda Smith, suffers from opioid use disorder ("OUD"), a deadly disease that has claimed the lives of thousands of Mainers and more than half a million Americans. *See* Pl.'s Exs. 30, 32, 39, 49-51, 61.[1] In this civil rights case, Ms. Smith asks the court to exercise its broad equitable powers to ensure that she is not forced off of her prescribed medication— and thereby placed at an increased risk of relapse, overdose, and death—when she reports to the Aroostook County Jail for a 40-day sentence. *See* Pl.'s Mot. Prelim. Inj., ECF No. 9 (Nov. 5, 2018); Pl.'s Reply, ECF No. 18 (Nov. 26, 2018).

The expert testimony in this case clearly demonstrates that opioid use disorder is a serious chronic disease. Tr. 125:11-21; 131:11-23 (MacDonald); 652:11-13 (Fellers). It shows that medication-assisted treatment ("MAT")—with buprenorphine or methadone—is an effective treatment that is essential for many patients, including Ms. Smith. 129:11-23 (MacDonald); 679:16-680:1 (Fellers); Conner Tr. 15, ECF No. 62, 15:14-16:5, 20:2-24. And it shows that,

---

[1] References to Plaintiff's trial exhibits are referred to as "Pl.'s Ex. __," references to the trial transcript are referred to as "Tr. Page:Line," and references to testimony by designation are identified by witness, for example, "Willette Tr. at Page:Line."

despite the ongoing stigma against addiction treatment, MAT is feasible in the correctional setting. Tr. 199:18-21 (MacDonald); 521:22 -522:14 (Hayes); 688:5-689:14 (Fellers). Forcing patients like Ms. Smith into withdrawal from their MAT— particularly during a stressful period of incarceration—can be dangerous and even deadly. Tr. 123:23-124:1; Pl.'s Exs. 75, 77, 78, 80, 81, 82.

Against this backdrop, there is no justification for Defendants' stated plan to deprive Ms. Smith of her medication during her upcoming 40-day incarceration. Applying their policy of prohibiting "opioid replacements" (Pl.'s Ex. 95) would force Ms. Smith into painful withdrawal and increase her risk of relapse, overdose, and death. Ms. Smith has known many people who died from opioid overdose and is terrified what forced withdrawal would mean for her and her children. Tr. 39:15-24; 56:19-22. Her mother is afraid of losing her daughter. Tr. 329:6-19, 330:20-331:4.

Ms. Smith seeks equitable relief to protect her against these serious risks of harm. Regardless of whether the Defendants provide the prescribed medication in jail, grant medical furlough, or provide access through other means, Ms. Smith asks the Court to ensure that she receives her buprenorphine medication (or equivalent) throughout her sentence. Ms. Smith simply asks that her medical needs be taken as seriously as any other inmate with a serious and chronic disability.

## DISCUSSION

As discussed below, there is no procedural hurdle to deciding this case; the Plaintiff's claims are ripe and not moot. On the merits, Ms. Smith has presented overwhelming evidence in support of her Eighth Amendment and ADA claims. Finally, although consolidation of the hearing would best conserve judicial resources, *any* injunctive relief (whether preliminary or

permanent) protecting Ms. Smith during her upcoming incarceration would satisfy the requested relief in this case. Each of these issues is addressed in greater detail below.

## I.   <u>Plaintiff's Claims Are Justiciable</u>

Ms. Smith has presented a live controversy challenging the Aroostook County Jail's Opiate Withdrawal Protocol, which a jail representative has stated would apply to Ms. Smith during her upcoming incarceration. *See* Pl.'s Exs. 8, 95; Willette Tr. 123-24.[2] The Court need look no further than *Pesce v. Coppinger* to find an example of a Court ordering relief based on practically identical facts. *See* No. 18-CV-11972-DJC, 2018 WL 6171881 (D. Mass. Nov. 26, 2018).

## A.   Ripeness

This controversy is ripe for adjudication. The ripeness doctrine seeks "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner,* 387 U.S. 136, 148 (1967). Determining ripeness involves evaluation of "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration," *id.* at 149, and a strong showing on one prong may compensate for weakness on the other. *Ernst & Young v. Depositors Econ. Prot. Corp.,* 45 F.3d 530, 535 (1st Cir. 1995). In this case, the fitness and hardship prongs both favor Ms. Smith.

First, the case is fit for judicial review with clear stakes on both sides. This case differs from other scenarios where an additional agency decision could "further define [the] injury," thus requiring the plaintiff to exhaust available administrative remedies before filing suit. *See, e.g.*, *Sunrise Detox V, LLC v. City of White Plains*, 769 F.3d 118, 124 (2d Cir. 2014). In this case,

---

[2] Designated portions of Alison Willette's deposition testimony, in which she testified on behalf of the Defendants under Rule 30(b)(6), were admitted into evidence. Tr. 324:14-21; Tr: 615:2-6; Pl.'s Ex. 100.

there is no procedure for Ms. Smith "to get advanced approval to receive a medication in Aroostook County Jail," and thus no administrative remedies to exhaust. Willette Tr. 104:14-18.

Nor is Ms. Smith required to wait until she is incarcerated before filing suit. As the Supreme Court has cautioned, "[i]t would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). In this case, the Aroostook County Jail has *never* provided an exception to its policy barring MAT for a non-pregnant inmate, and the nurse who is responsible for administering the withdrawal protocol has already confirmed that the protocol would apply to Ms. Smith. Tr. 378:14-379:3; 410:15-18 (Clossey); Willette Tr. 123:19-124:3.

Second, the hardship prong also favors Ms. Smith, who would suffer greatly if the Court denies judicial review. According to Defendants' own representations, the jail will apply its policy of forced withdrawal to Ms. Smith when she reports to jail. *See, e.g.*, Willette Tr. 123:15-124:3. Indeed, Defendants have done so to every other non-pregnant inmate, including patients whose physicians called ahead to notify the jail of a buprenorphine prescription. Tr. 410:15-18; Willette Tr. 75:14-25. For Ms. Smith, the hardship of waiting for a post-incarceration decision—and suffering from forced withdrawal in the interim—spikes her risk for relapse, overdose, or death. *See, e.g.*, Tr. 132:5-14; 137:1-4 (MacDonald). Those high stakes strongly favor a finding of ripeness.

**B.    Mootness and Voluntary Cessation**

Nor has this case become moot because of Commander Clossey's vague assurance to provide medical care if KVHC "think[s] it is medically necessary." Tr. 416:13-18 (Clossey). A case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally

4

cognizable interest in the outcome." *ACLU of Mass. v. U.S. Conference of Catholic Bishops*, 705 F.3d 44, 52 (1st Cir. 2013) (quoting, *e.g.*, *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). The issues in this case remain live because Defendants have not committed to provide Ms. Smith her prescription medication when she reports to jail, despite their recognition of her serious medical need. Although Commander Clossey has made ambiguous statements contingent on future actions by his medical staff, Tr. 487:9-11, those medical staff remain contract-bound to follow the Opiate Withdrawal Protocol (which generally prohibits MAT), and, according to Nurse Willette, the medical staff *will* follow the withdrawal protocol for Ms. Smith. KVHC Tr. 6:18-7:12, Willette Tr. 40:7-15.[3] Far from offering to abandon the unconstitutional protocol challenged in this case, Commander Clossey's statements represent an attempt to bolster and defend that protocol.

Even if the Aroostook County Jail had promised to provide Ms. Smith's medication when she reports (which it has not), it could not evade judicial review so easily. The voluntary cessation exception to mootness "traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *City News & Novelty, Inc. v. City of Waukesha,* 531 U.S. 278, 284 n. 1 (2001). The party asserting mootness bears "[t]he heavy burden" of showing "that the challenged conduct cannot reasonably be expected to start up again[.]" *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (internal citation and quotation marks omitted). Aroostook County cannot satisfy that burden. Not only has Aroostook County failed to promise any concrete relief

---

[3] Although the protocol attached to the current KVHC contract now states that opioid replacements (like buprenorphine) are not "regularly" permitted in the facility, Pl.'s Ex. 95, the underlying custom has not changed from the prior categorical prohibition in Plaintiff's Exhibit 8. *See* Tr. 370:16-371:9 (Clossey). Under that longstanding policy, there has been only a single instance in which Suboxone or other opioid replacements have been allowed in the facility—in the case of a pregnant woman. Tr. 370:16-371:9.

to Ms. Smith, nothing would stop it from applying their default policy of forced withdrawal to Ms. Smith when she reports on April 1. A judicial ruling is necessary to protect Ms. Smith's constitutional and statutory right to adequate medical care in jail.

## II.   Plaintiff Is Entitled To Injunctive Relief

Ms. Smith has demonstrated entitlement to the "extraordinary and drastic remedy" of preliminary injunctive relief. *Pesce*, 2018 WL 6171881, at *1 (citations omitted). As discussed below, she has satisfied her burden on each of the four equitable factors: (1) irreparable harm; (2) the likelihood of success on the merits; (3) the balance of equities; and (4) public interest. *Id.* (citing *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013)).

## A.   Ms. Smith Faces Irreparable Harm Absent Judicial Relief

To obtain injunctive relief, Ms. Smith must show a "significant risk of irreparable harm if the injunction is withheld." *Nieves-Márquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003). On comparable facts, another court recently held that the plaintiff would be "irreparably harmed" if deprived of his prescribed medication, methadone, while incarcerated. *Pesce*, 2018 WL 6171881, at *8. As this Court has similarly explained, "the Court takes as a matter of common sense that if an opiate addict is completely deprived of methadone treatment, he or she could suffer a variety of irreparable harms." *Metro Treatment of Maine, LP v. City of Bangor*, No. 1:16-CV-00433-JAW, 2016 WL 6768929, at *12 (D. Me. Nov. 15, 2016). Likewise here, depriving Ms. Smith of her prescribed medication would place her at risk of painful and dangerous withdrawal, complex psychological symptoms during withdrawal, as well as a heightened risk of relapse, overdose, and death. Tr. 132:5-14 (MacDonald); Conner Tr. 42:1-22, Tr. 687:11-688:1 (Fellers).

6

Ms. Smith's risks of overdose and death are particularly high given the rise of synthetic fentanyl in the illicit marketplace. Tr. 126:22-127:8, 127:9-14 (MacDonald). Fentanyl can be deadly even in very small doses "and now constitutes the leading substance found in opioid overdoses in many states," including Maine. Tr. 127:1-8; 670:6-671:4 (Fellers). Somebody in relapse can accidentally ingest fentanyl because "fentanyl has become difficult to avoid." Tr. 127:9-16 (MacDonald). According to Dr. Fellers, "it is more dangerous than it has ever been" to be in relapse and using illicit opioids. Tr. 674:9-13.

Ms. Smith is terrified that, as a result of Aroostook County's policy of forced withdrawal, she could "potentially . . . just lose everything." Tr. 60:1-2. On medication, Ms. Smith is able to prioritize her children, "keep [her] sanity and be a good citizen" in her community. *Id.* 62:10-12. With forced withdrawal from her medication, which she experienced once before, Ms. Smith is scared of a return to suicidal thoughts, and of "losing control of [her] OUD recovery." *Id.* 60:24-61:3. Even though Ms. Smith intellectually understands the dangers of seeking out illicit street drugs, she testified that she does not know what she might do if she loses control. *Id.* 61:16-62:5. Plaintiff's mom, Susan Smith, is similarly afraid for her daughter, and for her four grandchildren, saying "[i]f [Brenda's] not here, I don't know what would happen" to them. Tr. 330:22-331:7. None of these harms—the risks of mental breakdown, suicide, relapse, overdose, or death—can be compensated with money damages. They are irreparable.

## B.     Ms. Smith Has Successfully Proven Her Claims

Likelihood of success on the merits is the most important of the preliminary injunctive factors. *W. Holding Co. v. AIG Ins. Co.-Puerto Rico*, 748 F.3d 377, 383 (1st Cir. 2014) (citation omitted). To determine likelihood of success on the merits, the Court need only determine the "probable outcomes" of the underlying claims. *See Me. Educ. Ass'n Benefits Trust v. Cioppa*,

695 F.3d 145, 158 (1st Cir.2012). In this case—after twelve depositions and a five-day hearing with eleven witnesses (eight live and three by deposition) and more than forty exhibits—Ms. Smith prevails on both the likelihood-of-success analysis, as well as ultimate success on the merits.

## 1.    Defendants Have Violated the Americans With Disabilities Act

Ms. Smith has satisfied all three necessary elements for a successful claim under Title II of the Americans with Disabilities Act: 1) she is a qualified individual with a disability; 2) she was denied a benefit of the Aroostook County Jail's medical services, or was otherwise discriminated against; and 3) the denial and discrimination was by reason of her disability. *See* 42 U.S.C. § 12132; *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 (1st Cir. 2000).[4]

### a.    Ms. Smith Is a Qualifying Individual with a Disability

Ms. Smith suffers from opioid use disorder, a serious psychiatric illness and qualifying disability. *See* 11 Tr. 36:12-13 (B. Smith); *see also* 42 U.S.C. §12131(2) (defining a qualifying disability as "a physical or mental impairment that substantially limits one or more major life activities of such individual"); 28 C.F.R. § 35.108(b)(2); (stating that "[t]he phrase physical or mental impairment includes . . . drug addiction and alcoholism"); Pl.'s Mot. for Prelim. Inj. at 7-10, ECF No. 9.[5] This condition was diagnosed and treated by Ms. Smith's primary treating physician, (Connor Tr., 17:22-18:8), who regards her treatment with buprenorphine as successful (Connor Tr. 19:18-20). Ms. Smith testified that her OUD has substantially limited a number of major life activities, including caring for her own health, being a responsible mother to her

---

[4] Title II of the ADA applies to public entities, including jails and prisons. 42 U.S.C. § 12131(1)(B); *Pa. Dep't of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998).

[5] *See also Jones v. City of Boston*, 752 F.3d 38, 58 (1st Cir. 2014); *Metro Treatment of Me., LP v. City of Bangor*, No. 1:16-CV-00433-JAW, 2016 WL 6768929, at *8 (D. Me. Nov. 15, 2016).

children, maintaining employment, and maintaining relationships. Tr. 39:4-12 (B. Smith); 134:14-24 (MacDonald).

### b.      Defendants Deprive Ms. Smith of Medical Services for her Disability

Medical care is a benefit or service provided by jails, which cannot be withheld on the basis of disability. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998). Defendants' refusal to provide Ms. Smith with her prescribed MAT deprives her of the benefit of the Aroostook County Jail's healthcare program, which is established to provide care to prisoners who are, by virtue of their incarceration, unable to care for themselves. *See* 30-A M.R.S. §1561 (guaranteeing that persons incarcerated in Maine jail are provided with adequate professional medical care). This violation commenced on or about August 31, 2018, when Ms. Smith, through her counsel and her primary care doctor, sought an accommodation from the Aroostook County Jail. Pl.'s Ex. 5. Commander Clossey, in consultation with the Sheriff, refused to provide the accommodation. Tr. 497:23-501:9; Willette Tr. 102:15-103:9. Instead, he referred Ms. Smith to the jail nurse, who informed her that the jail would adhere to their established protocol and force her into withdrawal on arrival. Willette Tr. 106:18-25, 123:15-124:3.

### c.      Defendants Discriminate Against Ms. Smith Because of her Disability

Defendants have discriminated against Ms. Smith in three distinct ways—any one of which is sufficient to support a finding of liability. *See Nunes v. Mass. Dep't of Correction*, 766 F.3d 136, 145 (1st Cir. 2014) (discussing theories of ADA liability). First, Defendants' policies single out opioid use disorder for discriminatory treatment by refusing to provide appropriate care and instead forcing people who suffer from OUD into painful and dangerous withdrawal from their medications. Aroostook County Jail has a specific policy requiring individual treatment plans for prisoners who suffer from chronic illnesses. Pl.'s Ex. 3; Tr. 130:1-131:3

(MacDonald) (discussing similarities between opioid use disorder and diabetes); Tr. 351:7-16 (Clossey). Yet Aroostook County Jail does not include opioid use disorder among those illnesses, in policy or in practice. *Id.*; Pl.'s Ex. 95 (Opiate Withdrawal Protocol).

Second, Defendants impermissibly regulate the treatment for opioid use disorder differently than the treatment for other disabilities. Opioid agonists are controlled substance that are desirable by prisoners for both legitimate and illegitimate uses. Tr. 524:8-525:8 (Hayes). But, the same is true of benzodiazepines, which the jail provides to prisoners suffering from a variety of illnesses, despite the security risks. Willette Tr. 48:20-49:4; Tr. 208:8-12 (MacDonald); Tr. 399:19-22 (Clossey); 537:1-538:8 (Hayes); 1087:19-1088:10 (Kern). Even though benzodiazepines (like Lorazepam) are sometimes diverted and misused, Pl.'s Ex. 33, Defendants continue to provide it without any recorded special precautions, while refusing to provide buprenorphine to treat opioid use disorder. *See* Tr. 399:1-18 (Clossey); Willette Tr. 51:18-25.

Third, Defendants' policies improperly deny Plaintiff an accommodation that is necessary for her to maintain a baseline of health during and after incarceration. This accommodation is well within the ability of Defendants to provide, and in fact they have provided it previously to a pregnant prisoner. Willette Tr. 61:24-62:24. Defendants have not submitted any evidence showing that this accommodation undermined the safety and security of the facility. In fact, the jail administrator has forgotten almost everything about it, including where the accommodation took place. Tr. 373:2-374:15; 376:8-20 (Clossey).

The ADA was designed to ensure that people like Ms. Smith who suffer from disabilities are able live lives of safety and dignity. In this case, the ADA requires that the Defendants provide necessary medical accommodations for Ms. Smith's serious disability.

2.    **Defendants Are Deliberately Indifferent to Ms. Smith's Serious Medical Condition in Violation of the Eighth Amendment**

Aroostook County has been, and continues to be, deliberately indifferent to Ms. Smith's serious medical condition. The Eighth Amendment imposes a duty for jail administrators to attend to an inmate's "serious medical needs." *Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203, 208 (1st Cir. 1990); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  To prevail on an Eighth Amendment claim of deliberate indifference based on inadequate or delayed medical care, the plaintiff must satisfy both an objective and subjective inquiry—showing that the medical need is objectively "sufficiently serious" and that Defendants were subjectively aware of the risk of harm. *See, e.g.*, *Perry v. Roy*, 782 F.3d 73, 78 (1st Cir. 2015); *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Helling v. McKinney*, 509 U.S. 25, 31-32 (1993)).

The objective and subjective criteria are both satisfied here. Despite its obligation to provide adequate medical care, the Aroostook County Jail has a policy and custom of denying appropriate medical care to patients with opioid use disorder who are prescribed buprenorphine. A representative of Aroostook County has stated that this policy will apply to Ms. Smith when she reports to jail. Willette Tr. 34:3-14, 123:15-124:3. The Eighth Amendment violation occurred the moment that an Aroostook County Jail representative notified counsel of its intent to place Ms. Smith into forced withdrawal, and continues to this day.

a.    **Ms. Smith Suffers from an Objectively Serious Medical Condition**

It is undisputed that Ms. Smith's opioid use disorder constitutes a "serious medical need" protected by the Eighth Amendment. *See* Tr. 1104:17-20.[6] Opioid use disorder is a chronic disease that can be deadly. Tr. 125:11-21, 131:11-23 (MacDonald). Even before Ms. Smith

---

[6] In light of this concession, there would be no benefit to a remand to the Aroostook County Jail to evaluate Ms. Smith in advance of her reporting date. Having failed to submit expert testimony on the topic of Ms. Smith's medical needs at the five-day trial, the Defendants are not entitled to another bite at the apple.

developed opioid use disorder, she was at increased risk because of her genetic predisposition and history of childhood sexual abuse. 43:13-15, 44:1-13. When she was exposed to opioids—through a prescription for pain medication and her father selling her pills—Ms. Smith quickly developed opioid use disorder. Tr. 41:10-6; 43:16-20; 125:24-126:3. According to her primary care physician, Dr. Conner, Ms. Smith has a history of "all the classic" symptoms of opioid use disorder, including inability to control her use of opioids and trouble functioning because of her opioid use. Conner Tr. 18:1-8.

Dr. MacDonald, who reviewed Ms. Smith's medical records and listened to Ms. Smith's trial testimony, likewise explained that Ms. Smith described "critical factor[s]" for opioid use disorder, including "tolerance to the medication," compulsive use," "cravings," "withdrawal symptoms," and "adverse consequences in her life related to the trouble that she had with her children." Tr. 34:17-24 (MacDonald); *see also* Pl.'s Ex. 14 (DSM criteria for opioid use disorder). Although Ms. Smith is currently in recovery because of her prescribed medication-assisted treatment, opioid use disorder is "a lifelong disease," and taking her medication away would place her into withdrawal and at risk for relapse. Tr. 132:5-14, 138:8-16, 139:1-14, 23-25 (MacDonald).

### b. Defendants Are Subjectively Deliberately Indifferent to Ms. Smith's Serious Medical Condition

To prevail on the subjective prong, the plaintiff must show that the defendants acted with subjective intent or wanton disregard when providing inadequate care. *See Perry*, 782 F.3d at 79; *Pesce*, 2018 WL 6171881, at *7. Such intent or disregard "is often inferred from behavior." *Battista v. Clarke*, 645 F.3d 449, 453 (1st Cir. 2011). Aroostook County is deliberately indifferent because (1) their policy of forced withdrawal provides no effective treatment for Ms. Smith's opioid use disorder, and instead places her at increased risk of mental breakdown,

suicide, relapse, overdose, and death, and (2) Aroostook County has stated this policy will apply

to Ms. Smith despite its awareness of those serious, and potentially deadly, risks.

> ### i. Forced Withdrawal from Ms. Smith's Current Medication-Assisted Treatment Regimen Places Her at Risk of Suicide, Relapse, Overdose, and Death

The jail's policy and custom of forced withdrawal provides *no* adequate treatment for Ms.

Smith's opioid use disorder, instead placing her at a heightened risk of suicide, relapse, overdose,

and death. Tr. 132:5-14 (MacDonald); Conner Tr. 42:1-22, Tr. 687:11-688:1 (Fellers).

[R]ecovery is hard even with medication," and forcing an otherwise stable patient off of their

prescribed medication can be dangerous and potentially deadly. Tr. 129:17-25 (MacDonald); Tr.

681:6-13 (Fellers). Without medication, recovery is impossible for many patients with OUD. Tr.

659:15-660:1 (Fellers).

In Ms. Smith's case, forced withdrawal could trigger mental breakdown, suicide, relapse,

overdose, or death. Tr. 132:8-14, 136:23-137:4 (MacDonald); Conner Tr. 42:18-43:4. According

to Ms. Smith's physician, Dr. Conner, who "know[s] her quite well," "[t]his is a very fragile

patient." Conner Tr. 15:1, 69:20. Dr. Conner explained that previous attempts at tapering Ms.

Smith's buprenorphine medication have been "unsuccessful." *Id.* 21:1-17; *see also* Tr. 48:18-22

(B. Smith). The stress of her upcoming jail sentence means that "there's no way [she] can even

think about [tapering] now until this is all settled." Conner Tr. 21:8-11. Given Ms. Smith's

history of childhood trauma and genetic predisposition to addiction, Dr. Conner has explained

that "the fact that she's even upright . . . is astounding." Conner Tr. 16:3-5. Suddenly stopping

Ms. Smith's medication would trigger serious withdrawal symptoms, especially with her co-

occurring disorder of anxiety. Conner Tr. 20:7-11. That withdrawal, combined with Ms. Smith's

existing stressors and trauma history, would likely trigger her to "go back to using"—to relapse into active opioid use disorder. Conner Tr. 20:7-24, 22:12-23:2.

The testimony of expert Dr. Ross MacDonald supports Dr. Conner's well-founded fears about forced withdrawal for Ms. Smith. Patients with co-occurring disorders, like Ms. Smith, are at a heightened risk of complex withdrawal and exacerbation of mental illness, with "potential suicidality" a particular concern. Tr. 136:18-25 (MacDonald). "Suicide is the leading cause of death in jails and prisons in the United States," Tr. 137:1-4, and is a risk for Ms. Smith, who experienced suicidal thoughts during a prior seven-day forced withdrawal from buprenorphine. Tr. 54:3-20 (B. Smith).

Additionally, studies about opioid use disorder in jail show that Ms. Smith would face a dramatically increased risk of relapse, overdose, or death if withdrawn from her medication. *See* Pl.'s Exs. 75, 77, 80-82, 84, 87; Def.'s Ex. 40. The risk of death spikes immediately after release from jail or prison, with overdose the leading cause of death, and suicide the fourth highest. Tr. 149:10-150:22, 151:20-152:2 (MacDonald); Pl.'s Ex. 78. Providing or continuing medication-assisted treatment in jail reduces the risk of death in prison and after release. *See* Tr. 154:10-158:5; Pl.'s Exs. 77, 80, 81. Studies show "a decrease in mortality among patients who were treated with" opioid agonist therapy like methadone or buprenorphine "prior to release." Tr. 158:22-25 (MacDonald). Dr. Fellers' clinical experience confirms the harms associated with forced withdrawal in jail. Some of his patients who were forced into withdrawal in jail never came back to treatment, placing them at substantially increased risk of overdose and death. 682:10-684:20 (citing Pl.'s Ex. 72).

Overall, the literature "overwhelmingly supports the use of MAT," with both buprenorphine and methadone showing "much better" results than "no treatment" or "treatment

14

without medication." Tr. 679:16-680:5 (Fellers). "The general consensus now is to continue treatment with no arbitrary discontinuation." *Id.* The medical consensus has grown to the point that it would not be "ethically feasible to deny a group a medication that has such [a] proven track record at improving outcomes." Tr. 680:15-24 (Fellers); Tr. 177:14-178:12 (MacDonald).[7]

In recognition of this consensus, many national organizations have publicly supported the use of MAT, including the American Medical Association, American Psychiatric Association, American Academy of Family Medicine, the American Academy of Addiction Psychiatry, American College of Obstetrics and Gynecology, American Academy of Pediatrics. Tr. 680:6-14 (Fellers). Even organizations with a correctional focus, including the National Sheriffs' Association and the American Correctional Association, have issued statements and reports in favor of making MAT available in jails. *See* Tr. 192:9-195:23 (MacDonald).

Contrary to this clear consensus, Aroostook County Jail's policy of forced withdrawal provides no effective treatment for Ms. Smith's opioid use disorder, and, instead, places her at increased risk of suicide, relapse, overdose, and death.

    ii.    **Defendants Have Subjective Knowledge of the Risks Associated with Forced Withdrawal**

Aroostook County Jail has stated it will apply its policy of forced withdrawal to Ms. Smith, despite clear notice of the risks of withholding treatment for opioid use disorder. As an initial matter, the well-publicized opioid crisis itself should provide notice of the mortality risks associated with opioid use disorder. Pl.'s Exs. 30, 32, 39, 49-51, 61. Furthermore, Aroostook County Jail had notice of the potentially deadly consequences of its policy by late July 2018,

---

[7] The fact that Aroostook County Jail claims to provide some counseling does not ameliorate the dangerous consequences of forced withdrawal. Although "counseling or therapy alone" may be "appropriate treatment" for some patients, it is *not* effective treatment "for a patient who has benefited over a long period of time from MAT." Tr. 210:7-19 (MacDonald).

when they received notice of a Federal lawsuit alleging that the prohibition of MAT violates the Eighth Amendment and the ADA. *See Smith v. Fitzpatrick,* et al., Civ. No. 18-00288-NT. ECF No. 21 (filed July 26, 2018). Commander Clossey and Nurse Willette both submitted signed declarations in that lawsuit, in support of their policy. Exs. 5 and 6 of Def's Resp., *Smith v. Fitzpatrick,* et al., Civ. No. 18-00288-NT. ECF No. 21 (Aug. 23, 2018).

The Defendant entities have also received many communications relating to the devastating consequences of their policy of forced withdrawal. Testifying on behalf of the Defendants, Nurse Willette stated that she has received numerous requests by inmates, physicians, and other representatives requesting MAT in jail. Willette Tr. 75:14-25; 77:16-78:22; *see also id.* 34:3-14; 39:21-15. Those requests are routinely denied. *Id.*

In this case, Aroostook County also received a fax message from Ms. Smith's physician, Dr. Conner, stating that he had treated Ms. Smith for substance use disorder for years. *See* Pl.'s Ex. 5. Dr. Conner explained that "buprenorphine can be a lifesaving drug," and that we are facing an "addiction crisis." 382:9-385:1 (quoting Pl.'s Ex. 5). Despite actual notice of the dangers of forced withdrawal, the Aroostook County Jail stated that it would apply its Opiate Withdrawal Policy to Ms. Smith, notifying her representatives that Ms. Smith would be placed into withdrawal upon her arrival at the jail. *See* Willette Tr., 123:15-124:3.

Amid the ongoing opioid crisis, prior lawsuit, and many requests for medical treatment for opioid use disorder, Commander Clossey continues to insist that he doesn't "understand what opioid use disorder would be." Tr. 497:6-11 (Clossey). Nurse Willette, testified on behalf of the Defendants that she does not know "whether someone has OUD," Willette Tr. 109:2-4; 93:8-14, and is not aware of studies on the topic because she "find[s] them boring." *Id.* 99:13-19. Such ignorance to known risks provides a textbook example of deliberate indifference. Even the

16

Defendants' own expert testified that it would be "concerning" if a nurse did not know the symptoms of OUD. Tr. 1048:18-21 (Kern).

### iii.     Defendants' Security and Resources Concerns Are Easily Overcome and Do Not Justify An Unconstitutional Deprivation of Care

Defendants resist providing constitutionally required care for Ms. Smith based on concerns of diversion in the facility and the costs associated with monitoring medication administration. Neither reason provides a justifiable basis for refusing Ms. Smith's necessary medical care.

As an initial matter, although jail administrators are responsible for balancing security and health concerns in the jail setting, deference to administrator's discretion is appropriate only where the resulting jail policies are both reasonable and made in good faith. *See Kosilek v. Spencer*, 774 F.3d 63, 92 (1st Cir. 2014). In this case, an outright prohibition on MAT for all non-pregnant inmates is not reasonable and is likely driven (consciously or unconsciously) by the prevalent stigma against opioid use disorder and medication-assisted treatment. Tr. 688:2-689:23, 162:7-163:6, 165:23.

Prohibiting MAT is not a reasonable response to the legitimate concern of diversion. Dr. MacDonald and Ed Hayes both testified that risks of diversion associated with MAT are entirely manageable in the correctional setting. Tr. 199:18-21; 521:22 -522:14. Dr. Kern, the Defendants' expert, testified to numerous examples in his experience where buprenorphine is prescribed in the community and administered in the jails. Tr. 1031:22-1032:8, 1093:16-1094:2, 1095:11-25. And even Commander Clossey appears to recognize that, with appropriate procedures in place, administering MAT in the Aroostook County Jail would be feasible. Clossey 470:20-25 (discussing interest "in getting a program" at the Aroostook County Jail).

Despite raising concerns over diversion, Defendants have taken no meaningful measures to reduce diversion in their own facility, aside from prohibiting necessary medical care for people like Ms. Smith. For instance, Defendants maintain a "self-administration" medication protocol, Tr. 435:1-436:17, even for controlled substances like benzodiazepines, Tr. 51:18-52:4, and despite the fact that self-administration of benzodiazepines is a "severe security risk." Tr. 537:1-7 (Hayes). As another example, Commander Clossey has not taken basic steps to assess the feasibility of providing buprenorphine in the jail, such as contacting other facilities that provides buprenorphine treatment to learn how to safely administer buprenorphine treatment in the Aroostook County Jail. Tr. 404:16-405:2. Had he done so, he would likely have found that MAT is feasible in the corrections setting. According to Assistant Superintendent Hayes, who oversees a MAT program in Franklin County, Massachusetts: "When we have visitors to our facility who witness our protocols in action, speak to our security officers, and talk with our inmates, they are very often satisfied and their fears are assuaged." Tr. 949:1-7 (Hayes).

The real concern for Commander Clossey appears to be the costs associated with administering buprenorphine in the facility. Tr. 410:20-21 (stating Defendants "don't have the infrastructure, or the policies, or the training in place to . . . implement [buprenorphine treatment] safely" within the jail). Yet Aroostook County was offered funding for specifically this purpose as far back as April 2018. Tr. 467:1-6 (Clossey). In any event, "[i]t is not . . . permissible to deny an inmate adequate medical care because it is costly." *Kosilek v. Maloney*, 221 F. Supp. 2d 156, 161 (D. Mass. 2002). "Budgetary limitations or inadequate resources [...] can never be a valid justification for constitutional violations." *Morales Feliciano v. Rossello Gonzalez*, 13 F. Supp.2d 151, 210 (D.P.R. 1998). "[T]he cost of protecting a constitutional right cannot justify its total denial." *Bounds v. Smith*, 430 U.S. 817, 825 (1977). As such, a county government that

allocates "insufficient resources to accord inmates adequate medical care" can be forced to

"correct those conditions." *Peralta v. Dillard*, 744 F.3d 1076, 1084 (9th Cir. 2014).[8]

Aroostook County Jail accepts that providing medical care can be "a big lift"—

sometimes amounting to $250,000 or $300,000 per year for just one inmate—and that

"operationally [the jail has] to make it happen because it is required." Tr. 480: 17-18.  Indeed, if

costs were an excuse to evade constitutional requirements, many unconstitutional conditions

"could be constitutionally justified merely due to lack of funds." *Monmouth Cty. Correctional*

*Inst. Inmates v. Lanzaro*, 834 F.2d 326, 336 n.17 (3d Cir. 1987).  "Such a result impugns the

sanctity of the Constitution and finds no support in the case law." *Id.*

Furthermore, compared with the costs associated with treating other chronic conditions,

the costs of administering buprenorphine are minimal. The Defendants' primary cost concern

with providing MAT is the nursing staff needed to monitor administration of the medication. But

this cost is entirely manageable, whether for Ms. Smith alone (all that is requested in this case) or

for maintenance patients in general, for several reasons.

First, monitoring administration of buprenorphine medication would require different, but

not necessarily more, resources than the jail's existing Opiate Withdrawal Protocol. *See* Tr.

---

[8] *See also Wilson v. VanNatta*, 291 F. Supp. 2d 811, 816 (N.D. Ind. 2003) (allegation that prescribed pain reliever
and muscle relaxer and physical therapy were cancelled on grounds of cost states a deliberate indifference claim);
*Baker v. Blanchette*, 186 F. Supp. 2d 100, 105 (D. Conn. 2001) (unexplained denial of colostomy closure until after
the prisoner's release, allegedly "solely because of cost" supported a deliberate indifference claim);  *Hamm v.
DeKalb County*, 774 F.2d 1567, 1573 (11th Cir. 1985) ("state's interest in limiting the cost of detention ... will
justify neither the complete denial of ... [food, living space, and medical care] nor the provision of those necessities
below some minimally adequate level"), *cert. denied*, 475 U.S. 1096 (1986); *Wright v. Rushen*, 642 F.2d 1129, 1134
(9th Cir. 1981) ("costs cannot be permitted to stand in the way of eliminating conditions below Eighth Amendment
standards"); *Battle v. Anderson*, 594 F.2d 786, 792 (10th Cir.1979) ("'[C]onstitutional treatment of human beings
confined to penal institutions . . . is not dependent upon the willingness or the financial ability of the state to provide
decent penitentiaries'") (citations omitted); *Newman v. Alabama*, 559 F.2d 283, 286 (5th Cir.1977) ("[C]ompliance
with constitutional standards may not be frustrated by legislative inaction or failure to provide the necessary funds"),
*cert. denied*, 438 U.S. 915 (1978); *Mitchell v. Untreiner*, 421 F.Supp. 886, 896-97 (N.D.Fla.1976) ("'Lack of funds
is not an acceptable excuse for unconstitutional conditions of incarceration'") (citations omitted).

1093:5-15 (Kern). Monitoring withdrawal from MAT itself is resource-intensive because of the potentially dangerous consequences of withdrawal. *See* Tr. 1091-93:15. Defendants have not shown that administering buprenorphine tablets would require *more* resources than monitoring withdrawal. Indeed, the Aroostook County Jail previously provided a pregnant woman with buprenorphine in the normal course of business. Willette Tr. 21:17-22:1, 98:10-20 113:5-114:1.

     Second, Assistant Superintendent Edmond Hayes has provided a blueprint for successful and cost-efficient administration of MAT in a correctional setting. Tr. 514:1-3, 515:11-516:8, 546:12-556:3 (Hayes); Pl.'s Exs. 12, 17-19, 25. According to Assistant Superintendent Hayes' calculations, providing Ms. Smith with a daily buprenorphine dose would require approximately 20 minutes of staff time each day and would cost approximately $900 over the duration of her 40-day sentence. Tr. 557:2-14; Pl.'s Ex. 19, at 3. Mr. Hayes likened the $900 medical expense to the cost of a single x-ray—the type of unanticipated medical expense that jails throughout the country routinely shoulder. *Id.*

     Finally, Aroostook County recently updated their medical services contract to include increased nursing resources. Tr. 470:17-19; Ex. 95, at 1. Defendants have not shown that these increased resources would be insufficient to handle administering buprenorphine to Ms. Smith.

     **c.**    **Municipal Policy and Custom.**

     The Defendant entities in this case are liable under 42 U.S.C. § 1983 because the unconstitutional deprivation of Ms. Smith's medical care results from the Aroostook County Jail's policy and custom of prohibiting MAT. *Monell v. Dep't of Social Services*, 436 U.S. 658, 691 (1978); *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). The essence of so-called *Monell* liability is that there is a "direct causal link" between the municipality's policy or custom and the constitutional deprivation. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Here, the

Defendants are liable for both their policy and their custom of forcing prisoners who suffer from Opioid Use Disorder into withdrawal and refusing to provide medication-assisted treatment to prisoners.

Defendants maintain an official policy prohibiting MAT for prisoners in their custody. This policy is a part of the Aroostook County Jail's contract with its medical contractor, which requires the contractor to "abide by" the attached "Aroostook County Correctional Facilities Medical Policies." Pl.'s Ex. 95 at p. 1, 4, 26; Tr. 355:16-17, 364:11-20 (Clossey). One of the attached policies is the Opiate Withdrawal Protocol banning "opioid replacements" like buprenorphine. Pl.'s Ex. 95, at 26. Consistent with this policy, Commander Clossey testified that "Suboxone and its generic equivalent forms . . . is prohibited in the Aroostook County Jail." Tr. 368:13-14 (Clossey).[9] Indeed, "[t]he Aroostook County Jail does not permit the administration of Suboxone, or its generic equivalent, *to inmates other than pregnant women* due to the high potential for abuse of those medications within the facility." Tr. 369:16-20 (emphasis added). Importantly, both the Sheriff and Commander Clossey signed the current version of this protocol after Ms. Smith's lawsuit was filed in this case, Pl.'s Ex. 95, and Commander Clossey testified that the protocol has remained "substantively . . . the same" over time.[10] Tr. 425:13-15 (Clossey).

Applying this protocol (as she must under the contract), Nurse Willette explained that Ms. Smith "will not be getting her medication-assisted treatment." Willette Tr. 106:18-25,

---

[9] Consistent with this policy, Defendants previously stated that Plaintiff will be assessed when she arrives at Aroostook County Jail, but that assessment will only cover "the risk of opiate *withdrawal* symptoms. . . ." Def's Opposition (ECF No. 14), 2 (emphasis added). Regardless of the outcome of this evaluation, "Plaintiff would not be provided buprenorphine as this drug is specifically prohibited from the Aroostook County Jail." *Id.*

[10] Although the most recent version of the protocol now states that opiate and opioid replacements are not "regularly" permitted in the facility, the addition of the term "regularly" simply acknowledges the existing practice of allowing pregnant women to access Suboxone in the facility. The preceding protocol contained a complete prohibition, *see* Pl.'s Ex. 8, and Administrator Clossey conceded that "the preceding protocol" was "substantively . . . the same." Tr. 425:13-15.

123:15-124:3. "Because of" the Opiate Withdrawal Protocol, the jail's medical staff did not approve MAT even in prior cases when a community provider confirmed the prescription or a physician called ahead to say that a patient has OUD. Willette Tr. 78:7-22; 76:14-25.

In addition to its official policy, Defendants are liable for their custom of forced withdrawal and refusing to provide MAT to prisoners. To prove custom, a plaintiff must show: 1) a continuing, widespread, persistent pattern of unconstitutional misconduct; 2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and 3) a showing of causation that the custom was the moving force behind the constitutional violation. *Higgins v. Reed*, 2012 WL 3150813, at *4 (Torresen, J.) (*quoting Jane Doe A v. Special Sch. Dist. of St. Louis Cnty.*, 901 F.2d 642, 646 (8th Cir. 1990)). Each of these factors applies here, where the Defendants have continuously and persistently denied access to medication-assisted treatment to non-pregnant prisoners, and have made no accommodations for prisoners on MAT to obtain their medication outside of the facility. Willette Tr. 20:20-21:3; 24:3-10; Tr. 425:13-15 (Clossey); Tr. 378:14-21, 378:22-24, 378:25-379:3. Defendants maintain this custom despite the clear medical dangers associated with its policy of forced withdrawal and its subjective knowledge of those risks. *Supra* at 16-17. Finally, the Aroostook County Jail's custom is the moving force behind its stated plan to force Ms. Smith into withdrawal when she arrives at the facility. Willette Tr. 106:18-25; 123:24-124:3.

## C.   The Balancing of the Equities in this Case Tips in Favor of Granting Injunctive Relief

Balancing "the competing claims of injury" and considering "the effect on each party of the granting or withholding" the requested injunction, *Winter v. Nat. Res. Def. Council, Inc.*, 555

U.S. 7, 24 (2008), the Court should conclude that equitable considerations tip in Ms. Smith's favor.

If the injunction is granted, Defendants will be required to administer care that they have previously administered on at least one occasion with no recorded impact on their operations. *See* Tr. 376:8-14 (Clossey); Willette Tr. 61:24-62:24. The Aroostook County Jail has mechanisms in place to prevent medicine from being diverted, Tr. 350:1-23 (Clossey), and the experts in this litigation have provided a highly detailed playbook on how to implement additional protocols, *see, e.g.*, Tr. 526:13-533:6.

In contrast, if the injunction is denied, Ms. Smith faces a well-documented risk of suicide, relapse, overdose, and death. Tr. 132:5-14 (MacDonald); Conner Tr. 42:1-22, Tr. 687:11-688:1 (Fellers). The risks to Ms. Smith extend to her mother, her fiancé, and her four children, who would all suffer if Ms. Smith relapses into the devastating patterns of active opioid use disorder, overdoses, or dies. Tr. 144:2-10 (MacDonald) (describing potential consequences of relapse); 330:22-331:7 (S. Smith) (discussing concerns for her daughter and grandchildren).

**D.    The Public Interest Supports Granting Brenda Smith's Injunctive Relief**

The public interest weighs in favor of ordering Defendants to provide necessary medication to Ms. Smith during her time in their custody. According to the U.S. Centers for Disease Control and Prevention (the "CDC"), more than 630,000 people have died from a drug overdose between 1999 and 2016. Pl.'s Ex. 49.  Around 66% of more than 63,600 drug overdose deaths in 2016 involved an opioid.  *Id.*  The number of opioid overdose deaths was five times higher in 2016 than in 1999.  *Id.*  On average, 115 Americans die every day from an opioid overdose.  *Id.* While jails and prisons are not going to fix this problem, it is in the public's interest that they stop making matters worse.

**III.    Consolidation Would Conserve Judicial Resources, But Is Not Necessary for Complete Relief**

Also pending before the Court is the Plaintiff's motion to consolidate the preliminary injunction hearing with the trial on the merits, pursuant to Rule 65(c) of the Federal Rules of Civil Procedure. The Defendants oppose the motion and seeks a jury trial on the merits. As discussed below, consolidation would best preserve judicial resources, but is not necessary to afford Ms. Smith complete relief at this stage.

As previously argued, Pl.'s Mot., ECF No. 47 (Feb. 6, 2019), consolidation would preserve judicial resources and is appropriate at this stage of litigation, after twelve depositions, exchange of documents, and close of discovery on February 15, 2019. The Plaintiff is prepared to rest her case on the merits based upon the evidence submitted at trial, after notice by the Court of conditional consolidation. *See* Order, ECF No. 47 (Feb. 7, 2019). Additionally, Ms. Smith currently seeks only equitable relief forcing the Aroostook County Jail to provide her medication, and such purely injunctive relief does not implicate the Defendants' right to a jury trial. *See*, *e.g.*, Pl.'s Mot. at 2, ECF No. 47 (citing *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 564 (1990)).

Nonetheless, even a preliminary injunction in Ms. Smith's favor—whether ordering the Aroostook County Jail to provide her medication, to grant medical furlough, or otherwise to protect her against forced withdrawal—would protect Ms. Smith from forced withdrawal and likely foreclose any subsequent damages claim. Regardless of whether the Court issues its order as a preliminary or permanent injunction, granting such protection for the forty days after April 1 would effectively end the litigation.

## IV.    The Court Should Accept the Amicus Briefs to Assist in Deciding this Important Issue

Two groups with specialized knowledge in the subject matter of this litigation and interests in the ultimate outcome have sought leave to file Amici Curiae briefs. *See Motion of Public Health Scholars*, ECF No. 31 (Jan. 29, 2019); *Motion of Maine Medical Assoc. et al.*, ECF No. 36 (Jan. 30, 2019). District Courts have broad discretion to accept *amicus curiae* briefs, and the affirmative exercise of such discretion is especially appropriate when, as here, the case involves legal issues that have potential ramifications beyond the parties involved and the *amici* have unique information and perspective that can be of assistance to the court. *See Verizon New England v. Me. PUC*, 229 F.R.D. 335, 338 (D. Me. 2005). Plaintiffs urge the court to grant these motions and to "take the briefs for what they are worth." *See Portland Pipe Line Corp. v. City of S. Portland*, No. 2:15-CV-00054-JAW, 2017 WL 79948, at *5 (D. Me. Jan. 9, 2017).

## CONCLUSION

For these reasons, as well as those presented in Plaintiff's original motion, we respectfully request the Court to preliminarily and permanently enjoin Defendants to provide Ms. Smith with medication-assisted treatment during her 40-day incarceration.

Dated: February 22, 2019

Respectfully Submitted,

/s/ Emma E. Bond
Emma E. Bond, Esq.
/s/ Zachary L. Heiden
Zachary L. Heiden, Esq.
American Civil Liberties Union of Maine
Foundation
121 Middle Street, Suite 200
Portland, ME 04101
(207) 619-8687
*ebond@aclumaine.org*
(207) 619-6224
*heiden@aclumaine.org*

/s/ David Soley
David Soley, Esq.
/s/ James Monteleone
James Monteleone, Esq.
Bernstein Shur
100 Middle Street
Portland, ME 04101
(207) 228-7300
*dsoley@bernsteinshur.com*
(207) 228-7198
*jmonteleone@bernsteinshur.com*

Peter Mancuso, Esq.
Andrew Schmidt Law PLLC
97 India St.
Portland, ME 0410
207-619-0320
*peter@maineworkerjustice.com*

Counsel for the Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2019, I electronically filed PLAINTIFF'S POST-

TRIAL MEMORANDUM with the Clerk of the Court using the CM/ECF system that will send

notification of such filing(s) to all attorneys of record.

/s/ Emma E. Bond
Emma E. Bond, Esq.
American Civil Liberties Union of Maine
Foundation
121 Middle Street, Suite 200
Portland, ME 04101
(207) 619-8687
*ebond@aclumaine.org*