# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| BRENDA SMITH, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>AROOSTOOK COUNTY and SHAWN )<br>D. GILLEN in his official capacity as )<br>Sheriff of Aroostook County, )<br>)<br>Defendants. ) | Docket No. 1:18-cv-352-NT |

## ORDER ON PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Plaintiff Brenda Smith's doctor has prescribed her a twice-daily dose of buprenorphine as part of a medication-assisted treatment ("**MAT**") program for her opioid use disorder. Ms. Smith brings this lawsuit against Defendant Aroostook County and against Defendant Shawn Gillen, in his official capacity as Sheriff of Aroostook County, alleging that the Defendants' refusal to allow her to continue taking her medication during her impending 40-day term of incarceration at the Aroostook County Jail (the "**Jail**") violates the Americans with Disabilities Act ("**ADA**") and the Eighth Amendment. Before me is the Plaintiff's motion for a preliminary injunction requiring the Defendants to provide her with access to her prescribed medication. Pl.'s Mot. for Prelim. Inj. (ECF No. 9). For the reasons that follow I **GRANT** the Plaintiff's motion for a preliminary injunction.

# FINDINGS OF FACT

From February 11th to February 15th, 2019, I held an evidentiary hearing on the Plaintiff's motion. I make the following findings of fact based on the testimony and exhibits presented during the hearing and on admissions made by the parties in their preliminary injunction filings.

## I. Diagnosis and Treatment of Ms. Smith's Opioid Use Disorder

Ms. Smith began abusing opioids at the age of 18. Tr. 41:10-11, 42:4-43:7.[1] She recalls her use starting with prescribed medication, but quickly escalating into illicit use of hydrocodone, Percocet, morphine, and eventually heroin. Tr. 41:12-19, 66:5-20. Ms. Smith's dependence left her unable to maintain employment or to care for her family, culminating in the loss of custody over her children. Tr. 39:4-7.

In 2009, Ms. Smith's doctor diagnosed her with opioid use disorder and prescribed her with Suboxone as part of an MAT program to treat that condition. Tr. 45:1-5, 48:14.[2] In 2014, Ms. Smith's provider switched her prescription to buprenorphine, which she continues to take to this day. Tr. 48:10-17. Ms. Smith's current physician, Dr. David Conner, has prescribed her to take 8 milligrams of buprenorphine twice daily. Dr. Conner has attempted to taper Ms. Smith's buprenorphine dosage on multiple occasions. Conner Dep. 21:1-8. Those efforts were

---

[1]     All "Tr." citations refer to the official transcript of the preliminary injunction hearing, available at ECF Numbers 96, 97, 100, 101, and 102. The cited page numbers refer to the page numbers of the full, consecutively-paginated transcript.

[2]     Opioid use disorder is a chronic disease characterized by compulsive use of opioids and an increasing need for additional doses over time that becomes damaging to a person's life. Tr. 124:25-125:2.

not successful, and Ms. Smith's maintenance dose of buprenorphine remains necessary. Conner Dep. 21:1-8, 22:22-23:2, 43:12-24, 54:11-20; Tr. 48:18-22. Ms. Smith's condition is currently stable on her medication, and Dr. Conner considers her one of his success stories. Conner Dep. 34:11-13.

With the help of her medication, Ms. Smith has been in active recovery for her opioid use disorder for approximately ten years. During that time, Smith has regained custody of her four children, secured stable housing for her family, and obtained employment. Tr. 34:5-9, 35:19-36:4. She has earned her high school diploma and has begun to take college courses. Tr. 36:2-4, 330:5-14. Like many people with opioid use disorder, Ms. Smith's recovery has not been entirely smooth, and in the early years she occasionally relapsed. Tr. 47:10-12, 69:18-70:7. However, it has been five years since her last use. Tr. 48:5-6.

In 2014, Ms. Smith was incarcerated in the York County Jail for seven days. Tr. 53:24-54:2. During that time, she was not allowed to continue taking her daily prescription of Suboxone. Tr. 53:18-23. Ms. Smith describes her ensuing withdrawal as the worst pain she has ever endured and recalls experiencing suicidal thoughts for the first time in her life. Tr. 54: 3-14,18-20. Although Ms. Smith returned to her provider and resumed her MAT the day after she left the York County Jail, she is personally aware that one of her cellmates, who did not return to treatment, overdosed and died shortly after her release. Tr. 54:21-56:22.

## II.  Opioid Use Disorder Risks and Treatment in Correctional Facilities

Ms. Smith's anecdote about her cellmate is consistent with broader national trends. Numerous governmental and health organizations have warned that opioid

overdose death has reached crisis levels in the United States. Tr. 125:14-21; Pl.'s Ex. 98. In 2017, Maine's overdose death rate reached a record high, exceeding the nationwide average and representing a greater year-on-year increase than the surrounding New England states. Tr. 670:9-14, 672:3-7; Pl.'s Ex. 62. Most of these deaths were caused by fentanyl, a powerful opioid that can be deadly even in minute doses and that has seen a surge in availability in recent years. Tr. 126:22-127:8, 127:9-14, 670:16-671:19, 673:16-674:8. Opioid dealers will routinely mix fentanyl into their product, leaving unwitting people to ingest or inject the more dangerous narcotic and die. Tr. 127:9-21, 671:3-671:7, 674:9-13. While Maine's overall overdose death rate ticked down in 2018, the proportion of deaths from fentanyl increased. Tr. 673:16-674:8. Based on these statistics, the Plaintiff's expert Dr. Jonathan Fellers opined that it is more dangerous than it has ever been to be using opioids. Tr. 674:9-13. And the risk of overdose death is even higher among recently-incarcerated people and others who have just undergone a period of detoxification, because opioid tolerance decreases in the absence of use. Tr. 149:10-150:22, 151:20-152:2, 679:3-15.

Given the well-documented risk of death associated with opioid use disorder, appropriate treatment is crucial. People who are engaged in treatment are three times less likely to die than those who remain untreated. Tr. 678:10-14; Pl.'s Ex. 72. For some people with opioid use disorder, MAT is essential for successful recovery. Tr. 129:11-16. Dr. Fellers estimated that less than five percent of his patients could achieve and maintain recovery through counseling or abstinence alone. Tr. 667:21-24.

A body of evidence has emerged that permitting MAT in correctional facilities offers substantial, and possibly essential, benefits to incarcerated people. One study of English correctional facilities found that treatment with buprenorphine or methadone was associated with an 80 to 85 percent reduction in post-release drug-related mortality. Tr. 161:3-10; Pl.'s Ex. 82; *see also* Tr. 154:14-156:20; Pl.'s Ex. 77 (similar results from study of impact of MAT on post-release mortality in Australia). Participation in MAT during incarceration has also been associated with a reduced likelihood of in-custody deaths by overdose or suicide and an overall 75 percent reduction in all-cause in-custody mortality. Tr. 184:5-188:9, 1009:21-23, 1068-6-16; Pl.'s Ex. 79. And in a randomized, controlled trial conducted in the Rhode Island correctional system, incarcerated people who were permitted to continue taking their prescribed methadone were seven times more likely to continue treatment after release than were inmates who were forcibly withdrawn from MAT. Tr. 171:12-172:9, 176:13-20; Pl.'s Ex. 80.[3] The evidence of MAT's benefits has become so compelling that it would no longer be possible to conduct the kind of randomized trial that was

---

[3]     The Defendants' expert Dr. Donald Kern pointed to several aspects of these studies that make them imperfect sources from which to draw scientific conclusions relevant to the facts of this case. For example, several of the studies involved methadone instead of buprenorphine, others did not distinguish between individuals who had been on MAT when they entered prison and those who began treatment while incarcerated, and some were hedged in their conclusions—finding only correlations between observed trends rather than a causal link. On balance, however, these studies support the inference that MAT, abruptly withdrawn, can lead to post-release issues including failure to return to treatment, relapse, overdose, and death. *See* Tr. 178:13-25 (big picture takeaways of methadone studies are instructive on buprenorphine because "they are both agonist therapies that work in a very similar way"); Tr. 263:25-264:6 ("[T]he process of integrating the medical literature with clinical care is one of taking broader principles than the evidence that's available to us and applying it to the patient in front of us, and it is never the case that you have an entire study of only the patient in front of you."); Tr. 1020:25-1021:15; 1062:8-18 (while studies did not allow a scientific conclusion that someone going into jail for 40 days who is taken off MAT during that period would experience an increased risk of overdose or death, the studies did support that inference).

used in Rhode Island. Tr. 177:11-178:12, 680:15-24. As explained by Dr. Fellers, researchers would not consider it "ethically feasible to deny a group a medication that has such [a] proven track record at improving outcomes." Tr. 680:20-24.

Despite this growing evidence, only a limited number of facilities in the United States have programs in place to routinely provide MAT to inmates. The Plaintiff's witness Edmond Hayes, who developed and runs an MAT program at the Franklin County Jail in Massachusetts and who consults with other facilities about implementing such programs, offered some explanation of why this may be the case. Drawing on his experience working to encourage corrections personnel to put MAT programs in place, Mr. Hayes explained that law enforcement pushback often arises out of two interrelated fears: First, that opioid replacement medications are "drugs," not medicine, and that "bad" people should not be given "drugs"; and second, that opioid replacement medications are sought-after contraband in correctional facilities, and it does not make sense to introduce more "drugs" into a facility. Tr. 605:2-17.

## III. Treatment of Opioid Use Disorder in Aroostook County Jail

The Jail generally prohibits inmates from continuing to use opioid replacements such as buprenorphine while they are incarcerated in the facility. Clossey Aff. ¶ 2 (ECF No. 14-4) ("Suboxone and its generic equivalent forms (hereafter 'suboxone') is prohibited in the Aroostook County Jail."); Pl.'s Ex. 8; Pl.'s Ex. 95. The Jail has departed from this prohibition only in one instance, for a pregnant woman with opioid use disorder who had been prescribed MAT by her treating physician. Tr. 376:21-377:1; Willette Dep. 21:15-23, 72:2-5 (ECF No. 49). In that case, the Jail continued to provide the woman with her medication to avoid fetal harm. Tr. 835:11-

16; Willette Dep. 37:14-21. All other individuals who have been prescribed MAT and who have been incarcerated in the Jail have been required to go undergo withdrawal. Willette Dep. 72:2-5; KVHC Dep. 15:9-12; *see also* Willette Dep. 34:3-14; 39:21-40:15, 75:14-25, 77:16-78:22, 123:24-25.

The Jail contracts with Katahdin Valley Health Center ("**KVHC**") for the provision of medical services including management of medications. *See* Pl.'s Ex. 95. The Jail's contract with KVHC includes a set of policies that govern provision of health services at the Jail. Pl.'s Ex. 95. Among these policies is the Jail's opioid withdrawal protocol. The version of this protocol in effect when Ms. Smith was originally scheduled to report to the Jail stated that "[a]s we *do not use* opioid, or opioid replacements in the Aroostook County Jail, this protocol is designed to assist inmates during the withdrawal process." Pl.'s Ex. 8 (emphasis added).[4] The withdrawal protocol goes on to describe the steps that KVHC is to initiate "[i]f documented opioid use is found on entry." Pl.'s Ex. 8. These steps include assessing the presence and severity of the patient's withdrawal symptoms and, where indicated, providing the patient with medication that eases the symptoms of withdrawal. Pl.'s Ex. 8. As explained by Claudette Humphrey, who testified on behalf of KVHC, and by Alison Willette, a nurse employed by KVHC and the Defendants' 30(b)(6) representative, the decision not to use opioid replacements in the Jail was made at the Jail's direction, purportedly for security reasons. KVHC Dep. 27:18-22,

---

[4]     The protocol has been amended since the initiation of this litigation. It now states that "as we do not *regularly* use opioid or opioid replacements in the Aroostook County Jail, this protocol is designed to assist inmates during the withdrawal process." Pl.'s Ex. 95 (emphasis added).

72:21-73:17, 79:11-80:8, 81:6-17 (ECF No. 60); *see also* Willette Dep. 21:15-22:1, 41:18-42:3, 71:10-72:5.[5]

The withdrawal protocol is not a treatment for opioid use disorder. *See* KVHC Dep. 78:2-7; Defs.' Post-Trial Br. 16 (ECF No. 103). The only treatment that the Jail offers for opioid use disorder is substance abuse counseling. Willette Dep. 122:5-23.[6] Ms. Willette testified that she was unaware of opioid use disorder's symptoms or the standard of care for opioid use disorder. Willette Dep. 93:8-24. When asked whether she was aware of studies suggesting that forced withdrawal from MAT can lead to long-term negative outcomes for patients with opioid use disorder, Ms. Willette not only answered in the negative but stated that she tends not to read studies because she "find[s] them boring." Willette Dep. 99:13-19.[7] Commander Craig Clossey, the Jail's Administrator, was unfamiliar with the term "opioid use disorder" before the hearing in this action. Tr. 390:3-6.

In April of 2018, the Maine Office of Substance Abuse and Mental Health Services informed Cmdr. Clossey that the state had significant funds available to

---

[5]     Ms. Willette's answers on cross-examination during her deposition tended to undercut some of her answers on direct. Where her answers are contradictory, I credit Ms. Willette's spontaneous answers to the open-ended questions posed by Plaintiff's counsel on direct examination rather than her responses to leading questions on cross.

[6]     The Jail testified that Narcotics Anonymous meetings occur in the facility, and that the Jail contracts with Aroostook Mental Health Services to provide individual and group counseling programs to inmates with substance use disorders. Tr. 447:8-24; Willette Dep. 122:5-23. The exact nature and intensity of the offered counseling services is not in evidence.

[7]     While Ms. Willette's testimony displayed a lack of understanding of or interest in opioid use disorder and MAT, I do not mean to lay the Jail's actions in this case at her feet. From Ms. Willette's testimony, it is apparent that part of the reason that she did not educate herself about MAT and opioid use disorder was that she was under the correct impression that the Jail does not allow MAT except for pregnant inmates.

implement an MAT program at the Jail. Tr. 467:1-6, 469:16-21. Cmdr. Clossey contacted the Jail's medical providers, and they occasionally revisited the idea for several months without making forward progress. Tr. 467:7-470:3. Cmdr. Clossey indicated that the process was delayed because KVHC and Aroostook Mental Health Services (the Jail's mental health services provider) had difficulty finding someone licensed to prescribe and administer buprenorphine. Tr. 467:7-470:3. However, Ms. Humphrey testified that KVHC offered to have one of its providers certified to prescribe buprenorphine in the Jail and that the Jail did not accept that proposal. KVHC Dep.13:5-14, 13:25-14:1, 35:11-14. As of Ms. Humphrey's deposition on January 30, 2019, KVHC still had no personnel certified to prescribe buprenorphine. KVHC Dep. 13:8-10.

## IV.  Ms. Smith's Pending Incarceration at Aroostook County Jail

On December 24, 2017, Ms. Smith was using a self-checkout terminal at a Walmart when she noticed 40 dollars in change that another customer had failed to collect from the terminal. Tr: 57:12-58:10. Ms. Smith pocketed the money, completed her own transaction, and left. Tr. 58:4-58:10. Based on this conduct, Ms. Smith was later arrested and charged with theft. Tr. 57:4-13. Ms. Smith was convicted and sentenced to spend 40 days in the Aroostook County Jail. Tr. 56:25-7:5. While Ms. Smith was originally scheduled to report to the Jail on September 7, 2018, that surrender date was extended to April 1, 2019, to allow the further development of the case at bar.

## V. Defendants' Denial of Ms. Smith's Request to Continue Receiving Buprenorphine While Incarcerated

Upon learning that Ms. Smith would be incarcerated at the Jail, her counsel contacted the facility multiple times to ask whether she would be allowed to continue to take her buprenorphine. Two of counsel's phone calls reached Cmdr. Clossey. Tr. 474:5-475:8. On both occasions, Cmdr. Clossey told counsel that it was unlikely Ms. Smith would be allowed to continue taking her medication, but that the decision rested with "medical" (that is, KVHC). Tr. 474:5-475:8. Cmdr. Clossey transferred counsel's calls to KVHC. Tr. 474:5-475:8. When he reached KVHC, counsel repeated his question of how Ms. Smith's need for buprenorphine would be handled while she was at the Jail. Ms. Willette, who took counsel's call, informed him that Ms. Smith would undergo withdrawal and her symptoms would be treated in accordance with the Jail's withdrawal protocol. Willett Dep. 123:15-124:3. This was the same information that Ms. Willette had previously given to any other opioid use disorder patient who called to ask if they could continue on MAT while at the Jail. Willette Dep. 75:14-25; *see also* Willette Dep. 77:16-78:22, 123:24-25; Tr. 499:6-19.[8]

Ms. Smith's attorney also reached out to the Jail via fax. In the cover sheet of a letter faxed to Cmdr. Clossey on August 31, 2018, counsel asked Cmdr. Clossey to "please let me know if you need anything further in order to allow Ms. Smith to remain on her buprenorphine program when in your jail." Pl.'s Ex. 5 at 1. The letter

---

[8] On September 6, 2018, Cmdr. Clossey left counsel a voicemail stating that he had spoken about Ms. Smith's situation with Sheriff Gillen, and that Cmdr. Clossey would relate the contents of that conversation to counsel on a later call. Tr. 500:8-22. Cmdr. Clossey eventually reconnected with counsel, but he does not recall what they discussed. Tr. 500:20-25.

itself was a statement from Dr. Conner that generally addressed Ms. Smith's history of treatment with Suboxone and expressed concern about requiring a patient to withdraw from buprenorphine. Pl.'s Ex. 5 at 2.

Based on the evidence offered by the Plaintiff's experts, the available scientific evidence, and Ms. Smith's medical history, I find that forcing Ms. Smith to withdraw from her buprenorphine would cause her to suffer painful physical consequences and would increase her risk of relapse, overdose, and death. Tr. 131:24-132:14, 137:17-138:25, 693:5-19.

## PROCEDURAL HISTORY

On September 6, 2018, the day before she was to report to the Jail, Ms. Smith filed this lawsuit along with a motion for a temporary restraining order or a preliminary injunction. Compl. (ECF No. 1); Mot. for TRO or PI (ECF No. 3). The parties conferred and secured an extension of Ms. Smith's surrender date until January 14, 2019. *See* Order (ECF No. 12). The Plaintiff then withdrew her motion for a temporary restraining order, and the parties proceeded to brief the motion for a preliminary injunction. On December 3, 2018, the parties informed me that the Maine District Court again had allowed Ms. Smith to extend her surrender date, this time until April 1, 2019. Consent Mot. for Scheduling Order (ECF No. 20). To allow the parties to use this additional time for discovery, I set the motion for a preliminary injunction for a five-day evidentiary hearing beginning on February 11, 2019. Notice of Hearing (ECF No. 23).

On January 31, 2019, I held a pre-hearing conference of counsel. (ECF No. 37.) During that conference, counsel for the Plaintiff stated that she wished to withdraw her jury demand and requested that the upcoming preliminary injunction hearing be consolidated with a bench trial on the merits. The Defendants objected, arguing that the Plaintiff could not now withdraw her jury demand and that the preliminary injunction hearing could not fully resolve all issues in the case because additional facts remained to be developed. Specifically, for the first time the Defendants asserted that it was possible that the Jail *would* allow Ms. Smith access to her medication upon her surrender to the facility. I reserved ruling on the request to consolidate pending briefing by the parties. (*See* ECF No. 37.)

On February 6, 2019, the Plaintiffs moved for immediate decision on the issue of consolidation on the basis that I could not consolidate a preliminary hearing with a trial on the merits without providing notice to the parties. Pl.'s Mot. for Order Consolidating PI Hearing with Trial on the Merits (ECF No. 47). I conditionally granted the Plaintiff's motion, again pending full briefing, and instructed the parties to proceed at the hearing in the same manner they would at a bench trial. Order (ECF No. 52). The evidentiary hearing took place as scheduled.

The matter now being fully briefed, I **DENY** the Plaintiff's request to consolidate the preliminary injunction hearing with trial on the merits. The Plaintiff's Complaint demanded a jury trial and requested damages as a remedy for both of her claims. Compl. 11-12 (ECF No. 1). The Plaintiff's Complaint therefore included a valid jury demand predicated on a legal claim, which the Plaintiff may not

withdraw without the Defendants' consent.[9] Fed. R. Civ. Pro. 38(d) ("A proper [jury] demand may be withdrawn only if the parties consent."). As such, it would be inappropriate to consolidate the Plaintiff's claim for preliminary relief with final resolution on the merits. Fed. R. Civ. Pro. 65(a)(2) ("Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing. . . . But the court must preserve any party's right to a jury trial."); *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 553 (1990) (indicating that it would be error for a trial court to conclude "that resolution of an equitable claim can precede resolution of a legal claim"). I therefore solely address the Plaintiff's request for a preliminary, and not a permanent, injunction.

## DISCUSSION

### I. Ripeness

Before turning to the Plaintiff's showing on her preliminary injunction motion, I must first address the Defendants' contention that this matter is not yet ripe for review. The Defendants assert that the Plaintiff's request for preliminary relief is unripe because it is uncertain whether Ms. Smith will be denied access to her buprenorphine while she is incarcerated. Because an injunction may therefore be unnecessary, the Defendants argue, none should issue.

"[T]he doctrine of ripeness . . . asks whether an injury that has not yet happened is sufficiently likely to happen to warrant judicial review." *Mangual v.*

---

[9]     The Plaintiff's argument that no right to a jury trial exists in this action because she does not "currently" seek damages misses the mark. *See* Pl.'s Br. 24 (ECF No. 105). The Plaintiff's Complaint, rather than her whims, controls the scope of this action.

*Rotger-Sabat*, 317 F.3d 45, 60 (1st Cir. 2003) (quotation marks omitted). Ripeness analysis aims to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 535 (1st Cir. 1995). "When a litigant seeks relief that is primarily prospective in character, questions of ripeness are analyzed under a familiar framework that considers the fitness of the issue for immediate review and the hardship to the litigant should review be postponed." *Riva v. Com. of Mass.*, 61 F.3d 1003, 1009 (1st Cir. 1995). "The critical question concerning fitness for review is whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all." *McInnis-Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003) (quoting *Ernst & Young*, 45 F.3d at 536). "The hardship prong . . . is wholly prudential and concerns the harm to the parties seeking relief that would come to those parties from [the] withholding of a decision." *Reddy v. Foster*, 845 F.3d 493, 501 (1st Cir. 2017) (citations and quotation marks omitted).

To understand the Defendants' ripeness argument and why it fails, a more in-depth review of the history of this action is in order. This case first came before me because when the Plaintiff's attorney approached the Defendants to ask whether she would be allowed to continue to take her prescribed buprenorphine while she was incarcerated, the Defendants said that she would not. This denial is reflected in the Defendants' earlier filings, which state categorically that buprenorphine is not allowed in the Defendants' facility and which do not mention the possibility that the Defendants would in any way accommodate Ms. Smith's request for her medication.

Clossey Aff. ¶ 2; Defs.' Obj. to PI Mot. 2 (ECF No. 14). The Defendants argued that MAT is "but one means of treating opiate addiction," with others including "withdrawal protocols . . . through which symptoms of withdrawal . . . are managed medically," and that the Jail was entitled to deference in its choice between those two methods of treatment. *See, e.g.*, Defs.' Obj. to PI Mot. 3-4, 6.[10]

Then, just over a week before the evidentiary hearing on the Plaintiff's preliminary injunction motion was scheduled to begin, the Defendants changed tack. They now argue that the Jail has always made a case-by-case assessment of the medical needs of inmates who have been prescribed MAT by outside providers, and that the Defendants will do the same for Ms. Smith. The Defendants have gone so far as to hypothesize a variety of ways in which they might allow Ms. Smith to continue receiving her medication without ever needing to bring buprenorphine within the Jail's walls, including taking her into the community for treatment, procuring a long-lasting buprenorphine shot, or medically furloughing her from her sentence. Tr. 478:10-479:12. On these facts, the Defendants argue, the Plaintiff's claims are not ripe because she has yet to be denied access to her buprenorphine and she may never be so denied.

But, as I have found above, the Jail denied Ms. Smith's request to continue her buprenorphine in August of 2018. The Plaintiff filed this suit after that denial, and her claims were ripe for adjudication at that time. *See Pesce v. Coppinger*, No. CV 18-

---

[10]     While the Defendants' preliminary injunction response included a ripeness argument, the Defendants merely asserted that the Plaintiff's claims were not ripe because her jail sentence had twice been postponed.

11972-DJC, 2018 WL 6171881, at *5 (D. Mass. Nov. 26, 2018) (plaintiff's ADA and Eighth Amendment claims were ripe because plaintiff had prescription for methadone, his physician recommended continued treatment, and defendants' policy prohibited providing plaintiff with methadone during his incarceration).

The Defendants' insinuation that this is all merely a misunderstanding is unsupported. The credible evidence is that, with a single exception, the Defendants have summarily denied every prospective inmate's request to continue MAT, not because KVHC made some determination that MAT was not medically necessary, but at the Jail's direction. As to the Jail's single exception, in which a pregnant woman was allowed to continue MAT, the Jail was concerned about preventing fetal harm rather than the inmate's medical needs. Moreover, I cannot believe that the Defendants would have put themselves, the Plaintiff, and the Court through five months of expedited discovery and a five-day evidentiary hearing over a miscommunication. The more probable story is that the Defendants realized that they faced a greater risk of losing this lawsuit than they first thought, and that their efforts to rewrite the history of this case are meant to muddy the waters and avoid an unfavorable ruling.[11]

---

[11]    It is not lost on me that the Defendants' tactical shift came shortly after Judge Casper issued her recent decision in *Pesce v. Coppinger*, which granted the plaintiff's motion for a preliminary injunction allowing him to continue to take MAT while incarcerated in an action involving nearly-identical facts and claims to the case at bar. No. CV 18-11972-DJC, 2018 WL 6171881, at *7 (D. Mass. Nov. 26, 2018). The Defendants' evolved position appears intended to avoid the finding, dispositive in *Pesce*, that the defendants likely violated the ADA and the Eighth Amendment when they decided to require the plaintiff to be treated solely through withdrawal and counseling without ever evaluating his need for MAT. *See id.*

The question becomes whether the Defendants' indeterminate suggestions that they might walk back their earlier denial have left the Plaintiff's claims injusticiable. In some circumstances, "post-filing events will cause a case that was previously ripe for review to become unripe." *Pub. Serv. Co. of N.H. v. Patch*, 962 F. Supp. 222, 232 (D.N.H. 1997) (citing *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 139-40 (1974)).[12] However, "a litigant seeking shelter behind a ripeness defense must demonstrate more than a theoretical possibility that harm may be averted." *Riva*, 61 F.3d at 1011.

Here, the Defendants have stopped short of telling the Plaintiff that they will provide her with buprenorphine during her sentence.[13] It is no more than a theoretical possibility that the Jail will provide MAT after a medical evaluation of the Plaintiff. First, as I have found, the evidence shows that the Defendants' practice of denying individuals their prescribed MAT is the product of a directive from the Jail, not a medical decision by KVHC. No medical assessment is therefore necessary for

---

[12]    In this case, the Defendants allegedly engaged in discriminatory conduct when they first denied the Plaintiff's request to continue her medication. It is not clear to me that ripeness can be destroyed in such an action. *See Project B A.S.I.C. v. City of Providence*, No. CIV. A. 89-248P, 1990 WL 429846, at *3 (D.R.I. Apr. 25, 1990) (defendants' suggestion that they would reconsider location of shelter did not render plaintiff's civil rights claims unripe, where defendants' "alleged capitulation to racially motivated opposition" had already taken place, and reconsideration "would not erase the alleged harm of the first action"); *see also Jones v. Nationwide Life Ins. Co.*, 847 F. Supp. 2d 218, 223 (D. Mass. 2012) (ADA violation occurs at the time a request for accommodation is denied).

[13]    I asked the parties to brief the issue of whether the voluntary cessation exception to mootness might apply in this case. The Plaintiffs rightly noted that the voluntary cessation doctrine does not come into play until a Defendant has volunteered to cease unlawful conduct and that, in this case, the Defendants have made no such offer. *See Project B A.S.I.C. v. Providence*, Civ. A. No. 89-248P, 1990 WL 429846, at *3 (D.R.I. April 25, 1990) ("This situation is even more tenuous than that in cases where courts have refused to consider a voluntary cessation of challenged actions as mooting the case. In those cases, the courts have reasoned that the case is not moot because the defendant is free to return to his old ways. In this case, the defendant has not even changed from his old ways yet.").

the Defendants to change their position. Second, it is unclear whether KVHC is even capable of such a medical assessment. None of KVHC's providers is licensed to prescribe buprenorphine, and one of its nurses, Ms. Willette, testified that she knew neither the symptoms nor the standard of care for opioid use disorder. Third, to the extent that the Defendants believed they needed a medical assessment to decide whether the Plaintiff requires her medication, they have had five months in which to request that assessment.[14] It has always been within the Defendants' power to change their decision. Their failure to act leads me to conclude that the possibility they will do so now is purely "theoretical." *See id.*; *see also Patch*, 962 F. Supp. at 232 (defendant's post-filing suggestion that it would reconsider ratemaking decision did not render plaintiff's claim unripe, where defendant had already been presented with and had weighed all proposed arguments concerning ratemaking methodology at the time that it issued final regulation). The Plaintiff's motion is, accordingly, fit for adjudication.

As to whether the Plaintiff will suffer hardship absent immediate review, unless the Defendants' decision is definitively unwound, she faces an imminent, painful, and dangerous withdrawal and an attendant risk of discontinued treatment, overdose, and death. *See* Defs.' Br. 4 (describing "worst [case] scenario" in which "the Plaintiff will be withdrawn from buprenorphine"); *see also infra*, Section II.C. Both

---

[14]     At the prehearing conference, when defense counsel indicated that the Jail might actually provide Ms. Smith her medication if they determine it medically necessary, I suggested that the Defendants could get an assessment of Ms. Smith ahead of time. Defendant's counsel rejected that idea as contrary to his client's position.

prongs of the ripeness inquiry therefore are satisfied, and the Plaintiff's motion is ripe.

## II.  Preliminary Injunction

### A.  Legal Standard

"In determining whether to grant a preliminary injunction, the district court must consider: (i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013). The Plaintiff bears the burden of establishing that these factors weigh in her favor. *Esso Standard Oil Co. (P.R.) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006).

### B.  Likelihood of Success

The Plaintiff claims that the Defendants have violated the ADA either by denying her the benefit of the jail's health care programs because of her disability or by refusing to make reasonable modifications to a policy or practice in order to allow her to access necessary treatment for her disability.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A Title II plaintiff therefore must establish:

> (1) that [s]he is a qualified individual with a disability; (2) that [s]he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.

*Gray v. Cummings*, 917 F.3d 1, 15 (1st Cir. 2019).

Title II plaintiffs can pursue "several different types of claims of disability discrimination," including claims for "disparate treatment . . . , i.e., that the disability actually motivated the defendant's adverse conduct," and claims that the defendant "refused to affirmatively accommodate his or her disability where such accommodation was needed to provide 'meaningful access to a public service.' " *Nunes v. Mass. Dep't of Corr.*, 766 F.3d 136, 145-46 (1st Cir. 2014); *see also* 28 C.F.R. § 35.130(b)(7) (under the ADA, public entities must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity").[15] Disparate treatment claims are generally governed by the familiar *McDonnell Douglas* framework. *Id.* at 145. In contrast, a plaintiff pursuing a claim for denial of reasonable accommodation "need not directly address and satisfy the elements or methods for proving" a disparate treatment theory. *Id.*

When considering whether a correctional facility's medical decisions violated the ADA, the First Circuit has "differentiated ADA claims based on negligent medical

---

[15] While the Title II regulations refer to "reasonable modification" rather than "reasonable accommodation," courts treat those terms interchangeably. *Nunes v. Mass. Dep't of Corr.*, 766 F.3d 136, 146 n.6 (1st Cir. 2014).

care from those based on discriminatory medical care." *Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 284 (1st Cir. 2006). The First Circuit has allowed that treatment decisions can be so unreasonable as to constitute evidence of discrimination under the ADA, but has clarified that the

> showing of medical unreasonableness . . . must be framed within some larger theory of disability discrimination. For example, a plaintiff may argue that her physician's decision was so unreasonable—in the sense of being arbitrary and capricious—as to imply that it was pretext for some discriminatory motive, such as animus, fear, or apathetic attitudes. Or, instead of arguing pretext, a plaintiff may argue that her physician's decision was discriminatory on its face, because it rested on stereotypes of the disabled rather than an individualized inquiry into the patient's condition—and hence was unreasonable in that sense.

*Id.* at 284-85.

Here, the Defendants do not dispute that they are public entities or that the Plaintiff is a qualified individual with a disability. *See* Defs.' Post-Trial Br. 21.[16] The Defendants also allow that the Plaintiff is entitled to adequate medical care while she is incarcerated. Defs.' Post-Trial Br. 21; *see Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998). Instead, the Defendants argue that they have yet to deny the Plaintiff any benefit or accommodation, and that if they do so it will be because their medical staff has made an individualized determination that she does not need her medication and not because of her disability. Defs.' Post-Trial Br. 21-22.

The evidence, however, supports an inference that Ms. Smith was denied necessary medication because she suffers from OUD. Because the Defendants have

---

[16] "Individuals who are recovering from an addiction to drugs may be disabled in the meaning of the ADA" unless they are "currently using drugs, whether addicted or not." *Jones v. City of Boston*, 752 F.3d 38, 58 (1st Cir. 2014); *see also* 28 C.F.R. § 35.108(b)(2) ("drug addiction" may be a disability under the ADA). Here, there is no dispute that the Plaintiff is in recovery and not actively using.

never asked to assess Ms. Smith's medical needs, they have left Dr. Conner's conclusions uncontroverted. The evidence before me therefore establishes that prior efforts to take the Plaintiff off her medication have not been successful and that the Plaintiff's medication is necessary to her continued health. The Defendants informed the Plaintiff in August of 2018 that she would not be permitted to continue her MAT. The Defendants denied Ms. Smith's requests for buprenorphine without regard to her medical needs and without any true justification. The Defendants suggest that they generally disallow inmates from continuing MAT to prevent diversion of buprenorphine. But the Defendants themselves have described a variety of ways in which the Jail could provide Ms. Smith's buprenorphine outside of the Jail, thereby avoiding the security concerns associated with drug diversion. The Defendants have also allowed that, on the one past occasion when they provided MAT to a pregnant woman, they did so in the Jail itself without any known problems. The Defendants have offered no reason that the same could not be done for Ms. Smith.

The Defendants' out-of-hand, unjustified denial of the Plaintiff's request for her prescribed, necessary medication—and the general practice that precipitated that denial—is so unreasonable as to raise an inference that the Defendants denied the Plaintiff's request because of her disability. *Kiman*, 451 F.3d at 284; *see also id.* at 286 (correctional facility's withholding of plaintiff's prescribed medications was not "a medical 'judgment' subject to differing opinion[, but] an outright denial of medical services" that could constitute a violation of the ADA); *Pesce*, 2018 WL 6171881,at *7 (plaintiff was likely to succeed on ADA claim, where defendant intended to apply its

blanket prohibition on MAT to plaintiff despite plaintiff's past failure to overcome opioid use disorder through detoxification); *McNally v. Prison Health Servs.*, 46 F. Supp. 2d 49, 58 (D. Me. 1999) (denying summary judgment on plaintiff's ADA claim where defendant offered no justification for its practice of giving inmates immediate access to their prescribed medication unless that medication was for HIV).

This inference is bolstered by the Defendants' general attitude towards opioid use disorder. The Defendants' representatives lacked a baseline awareness of what opioid use disorder was despite serving a population that disproportionately dies of that condition. Ms. Willette suggested that learning more about how to treat the disorder was boring. And the facts show that despite an April 2018 offer of significant funds from the State to start an MAT program, the Jail and KVHC have not progressed beyond initial discussions about what such a program would entail and still have not taken steps toward having a provider certified to prescribe buprenorphine.[17] The Defendants' statements and actions suggest the kind of "apathetic attitude" towards individuals with disabilities that the ADA intends to remedy. *See Kiman*, 451 F.3d at 284. The Defendants' conduct is consistent with the broader stigma against MAT observed by Mr. Hayes, who noted that correctional staff often resist providing MAT because they equate MAT to giving addicts drugs rather than giving people treatment. *See Kiman*, 451 F.3d at 284 (treatment decisions based on "stereotypes of the disabled rather than an individualized inquiry into the

---

[17]    By way of contrast, Mr. Hayes' team at the Franklin County Jail moved from conception to implementation of an MAT program in three to four months. Tr. 563:21-564:2.

patient's condition" can constitute evidence of discrimination because of disability). Accordingly, I find that the Plaintiff is likely to succeed on her ADA claim under a disparate treatment theory.

In the alternative, I find that the Plaintiff is likely to succeed on the theory that she was denied a reasonable accommodation. The Plaintiff made multiple clear requests to be exempted from the Jail's practice of prohibiting buprenorphine and requiring individuals on MAT to undergo withdrawal.[18] Those requests were denied. Without her desired accommodation, the Plaintiff will be deprived of the only form of treatment shown to be effective at managing her disability and therefore will be denied "meaningful access" to the Jail's health care services. *Nunes*, 766 F.3d at 145. The Plaintiff's request was not unreasonable, as evidenced by the fact that the Defendants previously provided the same accommodation to a pregnant inmate without issue and by the Defendants' acknowledgement that they could grant the requested exemption in a way that would obviate any security concerns. For the same reasons, the Defendants have not "demonstrate[d] that making [this] modification[]" to its practice "would fundamentally alter the nature of" its healthcare or prescription services. 28 C.F.R. § 35.130(b)(7).[19] Because I find that the Plaintiff's ADA claim is

---

[18]    Remarkably, the Defendants claim that "[t]here is no evidence in the record that anyone contacted the jail with a specific request seeking advance approval for a medication for the Plaintiff." Defs.' Post-Trial Reply 6 (ECF No. 112). The record in this case shows with striking clarity that the Plaintiff's counsel contacted the Jail by both phone and fax with unambiguous requests for approval of the Plaintiff's MAT.

[19]    This case does not call upon me to find that the Defendants must institute a program that provides MAT for all individuals in the Jail who have opioid use disorder. All that is before me is the request to ensure MAT access for Ms. Smith, an individual who has successfully managed her opioid use disorder with MAT for the last decade.

likely to succeed under either or both of these theories, I do not address the Plaintiff's likelihood of success on her Eighth Amendment claim.[20]

## C. Irreparable Harm

Irreparable injury is harm that "cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). Here, the Plaintiff has presented evidence that if the Defendants curtail her MAT, she will be forced into withdrawal with painful physical symptoms and an increased risk of later relapse, overdose, and death.[21] Studies in the United States and abroad have observed that access to MAT during incarceration is associated with a decreased risk of post-release overdose death. Access to MAT is also correlated with a 75 percent decrease in all-cause mortality while the patient is incarcerated.[22] On the other hand, forced withdrawal from MAT during incarceration

---

[20] The evidence presented in this action suggests that a scientific consensus is growing that refusing to provide individuals with their prescribed MAT is a medically, ethically, and constitutionally unsupportable denial of care. *E.g.*, Pl.'s Ex. 32. Cognizant of the principle of judicial restraint and given my ruling that the Plaintiff is likely to succeed on her ADA claim, I sidestep the constitutional issue at this time. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.").

[21] The Defendants illogically insist that withdrawal does not amount to an injury because the Jail has a protocol in place to mitigate withdrawal symptoms. Defs.' Post-Trial Br. 3. This argument misses the mark in two respects. First, there is no indication in the record that the withdrawal protocol eliminates symptoms—in fact, the protocol accounts for the fact that symptoms may persist for days. Second, the Defendants' view assumes that withdrawal is a necessary evil. For incoming inmates who are active users of illicit opioids, withdrawal may be a necessary starting point for any treatment. However, for people like Ms. Smith, whose opioid use disorder is being successfully managed by MAT, withdrawal is a counterproductive, painful experience that is easily identified as an injury.

[22] In an attempt to convince me of the dangers of allowing buprenorphine in the Jail's formulary, the Defendants explained that Suboxone, like many other illicit drugs, is commonly and creatively smuggled into the Jail and used illegally by inmates. There is no question that Suboxone can be abused by people who are not prescribed it to control opioid use disorder. But in describing this reality, the

has been linked to a significant decrease in post-release resumption of treatment, with lack of treatment in turn being associated with increased risk of overdose and death.

The Defendants claim that these risks are overblown, in large part because the Plaintiff did not relapse, overdose, or die after her first forced withdrawal in 2014.[23] However, as Dr. MacDonald testified, that the Plaintiff was lucky enough to avoid the worst possible outcomes of forced withdrawal in the past does not mean she is immune to risk. *See* Tr. 138:1-14. Moreover, the Defendants do not account for the changes in the market for illicit opioids in recent years, which have seen the introduction of fentanyl into the supply and an attendant increase in risk that a single relapse may result in overdose and death. Considering all the evidence, I find that the Plaintiff has established a reasonable likelihood that she will suffer irreparable harm absent injunctive relief.

### D.    Public Interest and Balance of Hardships

I find that the final two factors of the preliminary injunction analysis, public interest and the balance of the hardships, both favor allowing Ms. Smith to continue taking her medication. Ms. Smith will personally benefit from receiving her medication, as she will avoid the wrenching side effects of withdrawal and continue

---

Defendants strengthen the Plaintiff's argument that she is likely to be harmed if her buprenorphine is abruptly stopped. Without her MAT, the Plaintiff will likely experience cravings for opiates and she will be in a facility where illicit drugs are available.

[23]    The Defendants also latch on to Dr. MacDonald's statement that the absolute risks of overdose and death are less than 50 percent. But as Dr. MacDonald observed, practitioners consider even a very low absolute risk of death to be medically unacceptable. Tr. 303:15-25.

to mitigate her likelihood of relapse. The public interest likewise favors encouraging Ms. Smith to remain on MAT and to continue her recovery. Society will be well served if Ms. Smith is able to continue to care for her children, maintain her housing, and work. History has shown that if she relapses into active use, she will lose all that she has worked so hard to achieve.

While I must accord substantial deference to the professional judgment of prison administrators, *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003), I find that in this individual case, granting the Plaintiff's requested injunction will place a limited burden on the Defendants. The Defendants have offered several ways in which Ms. Smith could be given her medication that would avoid any risk of diversion, the Defendants have previously permitted one inmate to receive MAT in-facility with no apparent security impact, and my findings in this case will do little to undermine the Defendants' broader policies or regulations. In particular, the Defendants will be free, going forward, to make exactly the kind of individualized assessments of inmates' medical needs for MAT that they have failed to make here.

Having found that all four preliminary injunction factors favor the Plaintiff, I will grant the Plaintiff's motion.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the Plaintiff's motion for a preliminary injunction. Pending final adjudication on the merits of this action, the Defendants are hereby **ORDERED** to provide the Plaintiff with her prescribed buprenorphine during her sentence at the Aroostook County Jail in whatever way

the Defendants deem most appropriate in light of the Aroostook County Jail's security needs, including, but not limited to, (1) providing the medication to the Plaintiff in the Aroostook County Jail, (2) taking the Plaintiff into the community on a daily basis to receive her medication, (3) transferring the Plaintiff to another facility capable of providing the Plaintiff her medication, or (4) releasing the Plaintiff on medical furlough if the jail is otherwise unable to accommodate her needs.

The Court also **DENIES** the Plaintiff's motion to consolidate the preliminary injunction hearing with trial on the merits of this action.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 27th day of March, 2019.